United States Bankruptcy Court
Southern District of Texas
**ENTERED**
April 12, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 20-31973 |
| **CARBO CERAMICS, INC.**, *et al.*, | § | |
| | § | CHAPTER 11 |
| Debtors. | § | |
| | § | |
| **CARBO CERAMICS, INC.**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 21-3031 |
| | § | |
| **BOARD OF TAX ASSESSORS FOR WILKINSON COUNTY GEORGIA**, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

CARBO Ceramics complains that it overpaid Wilkinson County under the tax-incentive structure agreed on by the parties. The parties disagree as to the proper valuation of the property for the purpose of CARBO's payments to the county under a bond-for-title structure. Among other issues, the parties dispute whether: (i) a 2008 Memorandum of Understanding (MOU) allowed for additional depreciation to be factored into the valuation of the subject property, (ii) a 2017 Settlement Agreement amended the MOU, and (iii) the sale-leaseback structure giving rise to the arrangement was in effect at the time of the valuation. At a hearing held on November 21, 2022, the Court declined to proceed with the valuation dispute until this threshold matter was resolved. The Court now holds that CARBO is not entitled to take additional depreciation for economic obsolescence or inutility under the terms of the 2008 MOU.

CARBO invites the Court to rule that CARBO's own defaults should allow CARBO to avoid its obligations to the community that invested in CARBO's hoped-for success. The Court declines the opportunity to stretch the law to reach such an inequitable result.

## BACKGROUND

The debtor, CARBO Ceramics, manufactures proppant used by the oil and gas industry in the process of hydraulic fracturing. (ECF No. 43 at 4). CARBO manufactures these products at two plants: the McIntyre Plant and the Toomsboro Plant. (ECF No. 43 at 4). In 2008, the parties entered into a Memorandum of Understanding (the 2008 MOU). (ECF No. 93 at 1). Under the 2008 MOU, CARBO would receive tax and other incentives. In return, CARBO was required to provide economic benefits to the community, including maintaining specified levels of employment. (ECF No. 70-26 at 133). CARBO failed to meet its economic goals, and now wants to be relieved of the economic burden that it undertook. To make things even more unpalatable, CARBO wants to recover all the ownership rights in the property, without being burdened by its MOU obligations.

The MOU was one component of a bond-for-title structure involving a series of interrelated agreements through which CARBO transferred title to the property in exchange for tax incentives and project financing to make the plants more productive. (ECF No. 70-26 at 134). CARBO received a "tax incentive" through a sale-leaseback transaction, which complimented a bond issuance. Rather than paying property taxes on the leased equipment and machinery, Carbo agreed to make payments in lieu of taxes (PILOTs) under the 2008 MOU. (ECF No. 70-26 at 246). The parties dispute how to interpret and apply the MOU's language regarding how to value the property for the sake of collecting the PILOTs. The MOU stipulates that the property is considered economic Life Group III property under Georgia's revenue code. It also contains a statement

(analyzed in detail below) that the property will operate on a "continuous 24 hour per day basis and shall be valued for ad valorem tax purposes at cost less depreciation." (ECF No. 70-26 at 142).

For several years, the plants operated at full capacity to keep up with high demand for ceramic proppant. (ECF No. 43 at 4). Beginning around 2014, CARBO alleges market forces compelled it to drastically decrease production at both plants. (ECF No. 43 at 5). The board of tax assessors for Wilkinson County allegedly failed to factor in the market forces which CARBO claims decreased the value of the property at the plants. (ECF No. 43 at 7). CARBO claims that for each of tax years 2015-2017, the county overvalued the property. (ECF No. 43 at 7). CARBO appealed the valuations for those years, and the dispute with the county ultimately lead to the 2017 Settlement. (ECF No. 43 at 7). The 2017 Settlement included acknowledgement of a *force majeure* event, but the parties disagree as to the effect (if any) of that acknowledgement on CARBO's PILOT obligations. (ECF No. 43 at 7).

For tax year 2018, CARBO submitted its rendition to the board of tax assessors for the market value of the property, in which CARBO claims it used the valuation methodology the parties agreed on in the 2017 Settlement. (ECF No. 43 at 8). This methodology, according to CARBO, would yield a 76% inutility discount for the Toomsboro Plant and a 66% inutility discount for the McIntyre Plant. (ECF No. 43 at 8). The board of tax assessors rejected CARBO's rendered values and applied a 0% discount for inutility. (ECF No. 43 at 8). CARBO again appealed the assessment. (ECF No. 43 at 8). In December of 2018, CARBO and the board of tax assessors agreed to work to resolve the appeals. (ECF No. 43 at 9). In the interim, CARBO paid the amount of the PILOTS, subject to a possible future refund. (ECF No. 43 at 8-9).

Likewise, in 2019 and 2020, the board of tax assessors allegedly overvalued the property by failing to account for inutility and economic obsolescence. (ECF No. 43 at 9). CARBO again made the PILOT payment subject to a possible refund. It challenged the assessments for both tax years. (ECF No. 43 at 9). CARBO filed for bankruptcy on March 28, 2020. (ECF No. 43 at 10). In 2021, the board of tax assessors issued what CARBO again alleges are inflated values, which CARBO protested. (ECF No. 43 at 10). CARBO filed this complaint, in which it seeks a refund for overpayments it believes it made on account of the allegedly inflated property values. (ECF No. 4 at 1). The Court halted the consideration of other aspects of CARBO's refund claim while it considered the preliminary legal issue of whether the valuation of the property could account for additional depreciation in the form of economic obsolescence and inutility on top of the depreciation already contemplated by the Georgia regulations for Life Group III property.

## DISCUSSION

The 2008 MOU provides for a valuation method which excludes the consideration of additional depreciation in the form of inutility and economic obsolescence. The 2017 Settlement was not a modification which altered the 2008 MOU. The lease did not terminate in 2017, and the MOU remained in effect at all times relevant to this proceeding.

**I.    THE 2008 MOU DOES NOT ALLOW ADDITIONAL DEPRECIATION**

Under the 2008 MOU, the parties stipulated that the property would be valued as Life Group III property under the relevant Georgia regulations. (ECF No. 70-26 at 142). Under some circumstances, Georgia's tax regulations allow an economic obsolescence deduction. CARBO argues the board of tax assessors should have factored in an obsolescence deduction for Life Group III property. GA. COMP. R. & REGS. 560-11-10-.08(5) (West 2023). While the appraisal manual allows the appraisal staff to consider different valuation methods, the parties specified that a cost

less depreciation approach would be used to value the property in this case for the purpose of calculating the amount of the PILOT payments. (ECF No. 70-26 at 142). Subsection (5)(f) of the manual lays out the method for valuing property using the cost approach under the Georgia regulations. GA. COMP. R. & REGS. 560-11-10-.08(5)(f)(4) (West 2023). The manual provides that, once the basic cost approach value has been determined (relying on a conversion factor associated with the economic life group of the property), additional depreciation may be taken on top of the basic cost approach value in the form of economic obsolescence. *Id*. at (f)(5)(iii) ("appraisal staff shall consider any evidence presented by the property owner demonstrating economic obsolescence for the type of personal property being appraised").

In making its argument that the 2008 MOU allowed for additional depreciation to be taken, CARBO quotes language from the agreement which specifies that "depreciation shall be calculated based on [Georgia Department of Revenue] requirements." (ECF No. 93 at 2). According to CARBO, the MOU would have had to include "an express exclusion" which foreclosed the possibility of considering the additional depreciation allowed under the regulations for such depreciation to not be factored into the valuation. The stipulation that the property would be operated on a continuous, 24 hour per day basis is precisely such an express exclusion. (ECF No. 70-26 at 142).

A contract is ambiguous where it is reasonably susceptible to more than one interpretation. *Begner v. United States*, 428 F.3d 998, 1005 (11th Cir. 2005). The sentence in the MOU which reads "the parties hereto acknowledge that the Machinery and Equipment . . . shall be operated on a continuous 24 hour per day basis" is ambiguous, but only if read out of context. Out of context, the sentence might be read as a covenant by which CARBO agreed to, in fact, operate the machinery 24 hours per day. It could also be read as a stipulation concerning the machinery and

equipment to which the parties agreed solely for the sake of valuation. Courts must apply the general rules of contract construction to resolve ambiguities. *Envision Printing, LLC v. Evans*, 336 Ga. App. 635, 638 (2016). "The cardinal rule of [contract] construction is to ascertain the intention of the parties." *Id*. (citing *Empire Distributors v. George L. Smith & c.*, 235 Ga. App. 742, 744 (1998)). Courts must look to the entirety of the contract and give the contract a "reasonable construction." *Id*. at 639. (first citing GA. CODE ANN. § 13-2-2; and then citing *McLendon v. Priest*, 259 Ga. 59, 60 (1989)). "Under Georgia law, courts examine a contract in its entirety in order to interpret any part thereof." *Begner*, 428 F.3d at 1005 (citing GA. CODE ANN. § 13-2-2(4)).

Looking within the four corners of the MOU, the only reasonable interpretation in context is that the language was intended by the parties to act as a stipulation concerning the proper valuation procedure for determining the PILOT payments. The language is housed in a subsection of the MOU entitled "Valuation Methods and Other Matters." (ECF No. 70-26 at 140, 141). Other sections of the MOU deal with what CARBO agreed to do physically with the property. (ECF No. 70-26 at 136). Language in a prefatory section of the subsection in which the at-issue language is found explains that "the provisions of this Section 8 set forth the agreement of the parties as to matters pertaining to the valuation of components of the Project." (ECF No. 70-26 at 140). That language implies that the reference to "continuous 24 hour per day" operation within Section 8 is intended to be a stipulation "pertaining to the valuation" of the machinery and equipment rather than an express covenant concerning its actual usage.

By contrast, the express covenants concerning the employment levels to which CARBO agreed are unambiguous and referenced throughout the MOU as the promise the county sought to "induce" from CARBO in exchange for financial incentives. (ECF No. 70-26 at 140, 144). The

"Jobs Goals" provision, for example, contains explicit language clarifying that the county should be afforded some relief if CARBO were to fail to deliver on its employment promises. (ECF No. 70-26 at 143-147). The "continuous 24 hour per day" operation language comes with no such explanations of any repercussion for not actually operating on a continuous basis. If the Court were to determine that the sentence was a covenant, it would be a covenant without consequence. A covenant without consequence is not a covenant at all; it is merely an empty promise. If it is viewed as only an empty promise, the Court would be giving no true meaning to the provision. That would not be a reasonable construction. *Envision Printing, LLC*, 336 Ga. App. at 639 (first citing GA. CODE ANN. § 13-2-2; and then citing *McLendon v. Priest*, 259 Ga. 59, 60 (1989)).

Under the regulations, the burden would be on CARBO to prove economic depreciation or inutility. GA. COMP. R. & REGS. 560-11-10-.08(5)(f)(5)(iii). But the language of the MOU has precluded CARBO from making such an argument as CARBO has stipulated to the full-time use of the equipment. (ECF No. 70-26 at 142). Alternatively, even if the parties intended to create a covenant with this language, CARBO would have been in breach of that covenant. CARBO cannot benefit from its own breach by factoring inutility into its PILOT payment where the parties had specified that it would operate the machines 24 hours per day. If it was an express covenant, CARBO shouldered the risk of failing to operate the machinery per the terms of the agreement, not the county. Principles of equity do not allow for a reading of this provision which would allow CARBO to choose to fail to perform under the terms of the agreement in order to receive additional financial benefits as a result of that failure. *See, e.g., Super98, LLC v. Delta Air Lines, Inc.*, 309 F. Supp. 3d 1368, 1378 (N.D. Ga. 2018) (recognizing a principle of contract construction in which courts should give a reasonable and equitable construction to a contract where unless contrary to the parties' clear intentions).

The county's stated intent in the MOU was to "induce CARBO" to upgrade the plants to keep them operational in order to meet set employment goals and benefit the county. (ECF No. 70-26 at 134, 140). CARBO's claim of depreciation because economic factors forced the plants into disuse is in direct contravention of the parties' stated goals in creating this structure. The MOU contemplated CARBO's use of the financial benefits it received to invest in the plants so that they would continue to be operational and continue to employ people in the county. If that was no longer a feasible goal for the reasons CARBO states in its complaint and on the record, CARBO had the ability to terminate the agreement, reacquire the property, and return to a standard tax structure. CARBO did not terminate the agreement, so it was bound to the terms of the MOU.

## II.   THE PARTIES DID NOT MODIFY THE 2008 MOU

CARBO next argues that, even if the 2008 MOU does not allow for economic depreciation, the 2017 Settlement provided for additional depreciation on a going-forward basis. This argument fails. The Georgia Code provides that "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." GA. CODE ANN. § 13-3-1 (West 2023). The 2008 MOU meets these requirements. The 2017 Settlement also meets these criteria. At issue is whether the 2017 Settlement can be read as a modification of the 2008 MOU under Georgia contract law.

In Georgia, "[a] contract modification is a change or alteration which introduces new elements into the details, or cancels some of them, but leaves the general purpose and effect of the subject matter of a contract intact." *Perkins v. M & M Office Holdings, LLC*, 303 Ga. App. 770, 773 (2010) (citing *Atlanta Integrity Mtg. v. Ben Hill United Methodist Church*, 286 Ga. App. 795, 799, n. 5, (2007)). "The terms of a written contract may be modified by a later oral agreement or

by the parties' course of conduct, when such agreement is founded on sufficient consideration." *Underwood v. Colony Bank*, 362 Ga. App. 548, 553 (2022) (citing *Hanham v. Access Mgmt. Group L.P.*, 305 Ga. 414, 417 (2019)). For the modification of a contract to be valid, the parties must manifest an intent to modify the original agreement. *Ryder Truck Lines, Inc. v. Scott*, 129 Ga. App. 871, 874 (1973).

Nowhere does the Settlement purport to either interpret or modify the language of the MOU. (ECF No. 70-2). Nor has the county, either in the 2017 Settlement or in their course of conduct under the 2017 Settlement, manifested any intent to modify the 2008 MOU. The Settlement merely recognizes that there was a dispute between the parties concerning the valuation of the property and represents the parties' resolution of that issue for the year 2017. (ECF No 70-2). The language CARBO cites to argue that the parties meant for the Settlement to amend the 2008 MOU provides that "[a]fter January 1, 2017 the Board will assess all properties related to this Settlement Agreement at their fair market values and the January 1, 2018 assessment values shall in no way be limited to the values agreed to herein." (EFC No. 70-2 at 4). CARBO seizes upon the "fair market values" language to argue that under the 2017 Settlement, the parties agreed to factor economic depreciation into the valuation of the property moving forward.

CARBO's reading of the phrase "fair market value" as requiring additional depreciation proves too much. "Fair market value" is the term used by the Georgia regulations cited in the MOU to reference the value placed on property for taxation purposes. GA. COMP. R. & REGS. 560-11-10-.08(5). The 2017 Settlement's reference to the use of fair market value moving forward is best read as an acknowledgement of two things: (i) that the county did not concede that the figures agreed upon in the Settlement represented the value required by the MOU, and (ii) that the parties would return to the use of the regulations' "fair market value" figure applying the method agreed

9 / 16

upon in the MOU moving forward. In short, the language clarifies that the Settlement was not meant to alter the parties' bargain for any year other than 2017. This reading is bolstered by the qualification in the Settlement that the values for the year 2018 "shall in no way be limited to the values agreed to herein." (ECF No. 70-2 at 4). The mere use of the phrase "fair market value" read in isolation is insufficient to manifest an intent of the parties to modify the MOU to change the valuation method in that agreement.

Georgia law does not strictly require a contract modification to be in writing, and even an oral modification may be valid though a written modification is required by an earlier agreement between the parties. *Underwood*, 362 Ga. App. at 539. But the Court agrees with the county that the provision in the MOU which requires modifications to be in writing signed by the parties to the MOU is still indicative of the parties' intent here. Two key parties to the MOU (the Development Authority and the Board of Education) did not sign the 2017 Settlement. (ECF No. 70-26 at 147, 149, 151; ECF No. 70-2 at 8). Only the county tax assessor signed the Settlement. (ECF No. 70-2 at 8).

Responding to the county's argument in this vein, CARBO contends that, by that logic, the board of tax assessors did not have the authority to enter into the 2017 Settlement without involving those parties. The Court disagrees and instead reads the exclusion of those parties as further evidence that the Settlement did not purport to amend the MOU or alter the bond-for-title structure or PILOTs in any way. As the party conducting the contested valuation, the board of tax assessors had the authority to agree to the Settlement even though defendants claim they did not have

authority to amend the MOU.[1] (ECF No. 70-2 at 8). It is not appropriate to conflate authority to settle a dispute with the authority to modify a contract. By CARBO's logic, any settlement of a contract dispute would constitute a modification of the contract itself. There is no support for such a blanket conclusion in the law. For these reasons, the Court rejects CABRO's arguments that the parties intended to modify the MOU with entry into the 2017 Settlement.

Nor did the 2018 Agreement modify the 2008 MOU. The express language of the 2018 Agreement contains no language that would convince the Court it was meant to amend the terms of the MOU on a go-forward basis. (ECF No. 70-4 at 1). The agreement is nothing more than a one-page document which (i) clarifies that there is an ongoing dispute between the parties concerning the proper valuation of the property and (ii) provides a timeline and avenue for the parties to work to resolve the issue. (ECF No. 70-4 at 1). Nowhere does the agreement modify the language of the MOU. Instead, it consistently uses language like "CABRO *alleges* other theories which *CARBO contends* shall reduce the assessment, including but not limited to, economic obsolescence and inutility." (ECF No. 70-4 at 1) (emphasis added). The only forward-looking language provides that "CARBO and the Assessors will continue to review the valuation data relevant to this assessment of the subject personal property," sets a date by which the parties were meant to resolve the dispute and allows CARBO to make an alternative or temporary payment during the pendency of the appeal. None of that language proposes any sort of resolution to how the MOU should be interpreted or purports to amend the MOU. (ECF No. 70-4 at 1).

---

[1] Even were CARBO's contentions regarding that authority valid, it would only mean that the 2017 Settlement was invalid. In that case, the parties would have been left to rely solely on the valuation method in the 2008 MOU rather than the stipulated Settlement values. For the reasons above described, the 2008 MOU did not allow for additional depreciation in the form of inutility or economic obsolescence.

CARBO alternatively argues that the Settlement and subsequent agreements concerning the multiple disputes over valuation over successive tax years constituted a mutual agreement to diverge from the terms of the MOU. CARBO cites a provision of Georgia law which mandates that

> [w]here parties, in the course of the execution of a contract, depart from its terms and pay or receive money under such departure, before either can recover for failure to pursue the letter of the agreement, reasonable notice must be given to the other of intention to rely on the exact terms of the agreement. The contract will be suspended by the departure until such notice.

GA. CODE ANN. § 13-4-4 (West 2023). For the reasons laid out above, CARBO has not shown that the board of tax assessors intended to "depart" from the terms of the MOU with the 2017 Settlement or other agreements in later tax years. Therefore, the parties' actions did not constitute a "mutual temporary disregard of contract" which would have allowed for CARBO to take additional depreciation in spite of the plain language of the MOU.

### III.   THE 2008 MOU DID NOT TERMINATE IN NOVEMBER OF 2017

The Court is puzzled by CARBO's argument that the lease had terminated by November of 2017. There is no rational basis to support the argument, nor does CARBO effectively raise it in their briefing on the (supposedly) narrow issue of whether additional deductions could be taken under the terms of 2008 MOU.

In relevant part, the lease agreement provided that if

> this 2008 Lease is in full force and effect and [CARBO] is not in default under the terms hereof beyond any applicable notice and cure period provided for herein, the Issuer hereby grants [CARBO] the option to extend the Term of this 2008 Lease on the terms stated herein, except as otherwise provided herein, for a renewal period expiring at 11:59 p.m., Irwinton, Georgia time, on November 1, 2017.

(ECF No. 70-26 at 40). The lease further specified that "the extension option shall be deemed to be exercised automatically unless [CARBO], at least one hundred eighty (180) days prior to the

expiration of the then-current Initial Term or Renewal Term, as applicable, delivers a Non-Renewal Notice." (ECF No. 70-26 at 41).

CARBO's argument that the lease terminated is rooted in factual allegations that CARBO was not meeting its employment quotas and that the parties were "not adhering to the 2008 MOU's terms." (ECF No. 70-26 at 10). CARBO does not claim that it exercised its option to not renew the lease by providing the written notice.

The lease states that CARBO "shall, in consideration of the lease structure and other benefits, make payments in lieu of taxes, in accordance with the payment percentages and terms provided in the Second Amended and Restated Memorandum of Understanding (the '2008 MOU')." (ECF No. 70-26 at 45). In theory, if CARBO did fail to pay under the MOU, it would be in default of this lease provision. CARBO disputes it failed to pay under the MOU or according to the Settlement, so it cannot not rely on an argument that the lease had terminated due to such a default. That argument would be circular. CARBO, in essence, argues that because it was in default, the lease had terminated, so it was no longer bound by the valuation provisions of the MOU, even though failing to make payments required by the MOU forms part of CARBO's basis for arguing it was in default under the lease. CARBO's briefing offers no support in the law for such an outcome. Nor does CARBO sufficiently deal with the legal effect of the fact that both parties seemingly continued to act as though the lease had not terminated.

In light of the undisputed fact that the parties were actively working to resolve the dispute over valuation and entered into settlement agreements to that effect, the Court does not find convincing CARBO's legally conclusory contention that the lease had terminated, so CARBO should be entitled to "recover a refund of the fees it had mistakenly paid to the authority" under the lease. (ECF No. 93 at 10). CARBO did not raise this argument in its complaint. CARBO

13 / 16

offers no legal support for why such an outcome would occur as opposed to a more equitable outcome that the lease was still in effect based on the parties' continued performance. *See, e.g., Astral Health & Beauty, Inc. v. Aloette of Mid-Mississippi, Inc.*, 895 F. Supp. 2d 1280 (N.D. Ga. 2012) (reasoning that even where a contract has technically expired, the parties' course of conduct may create an implied contract under similar terms as the original, written contract). In *Astral Health*, the court made the observation that while a court's "role does not include rescuing Plaintiff from its failure to renew its franchise agreements, it would appear to be equally offensive to permit Defendants to continue to reap the benefits of a franchise agreement after its expiration and be relieved of the burdens of the same agreement." *Id*. at 1283. For much the same reasons, it would be offensive to relieve CARBO of the burdens of the lease as a result of its own alleged default because it now suits CARBO to notice that the lease expired.

It is not appropriate to assume that even if the lease was terminated, the parties would default to a normal tax structure—there were multiple other agreements in the bond-for-title structure that counsel against that assumption. CARBO was not paying taxes. It was making payments *in lieu of taxes* (PILOTs) because it had transferred title to the property. (ECF No. 70-26 at 246). CARBO does not deal with what effect lease termination would have on the MOU or other aspects of the bond-for-title structure. The intricacy of the structure and the difficulty of unwinding it are apparent in the option the lease provides for CARBO to terminate the lease, which would require CARBO to "cause the bond to be paid." (ECF No. 70-26 at 257). Then, to reacquire title to the property and forgo the PILOT structure these multiple, interlocking agreements effectuate, the 2008 MOU provides that "CARBO may obtain title to the Project at any time by exercising its option to purchase the Project, thereby terminating the sale-leaseback structure. In

years following the year of such termination, the Project shall be subject to normal ad valorem property taxes." (ECF No. 70-26 at 140).

CARBO quotes the MOU out of context in arguing that terminating the MOU or lease agreement would mean an automatic return to normal property taxes. (ECF No. 93 at 10). CARBO quotes only the sentence from the MOU provision (quoted more fully above) which reads "[i]n years following the year of such termination, the Project shall be subject to normal ad valorem property taxes." (ECF No. 93 at 10). The phrase "such termination" does not mean any termination or termination by default. It clearly references back to the prior sentence, which contemplates termination via CARBO's exercise of its right to purchase the Project to reacquire the property and "cause the bond to be paid." (ECF No. 70-26 at 140). CARBO did not exercise this option and has not articulated how it is that the entirety of the sale-leaseback structure was terminated to the detriment of the county by *CARBO's own alleged default*. If the lease had terminated, CARBO did not pay the bond, relinquish the property, or reacquire title to property it continued to possess beyond the date CARBO argues the lease terminated.

CARBO correctly notes that it was not meeting its employment quotas. But the employment quotas were not a lease covenant. (ECF No. 70-26 at 32). Because it was not a lease covenant, the failure to maintain employment levels could not have triggered the lease's default provisions or prevented the automatic extension of the lease term past November of 2017. To the extent the failure triggered any default under the 2008 MOU, it would not affect the lease. In any case, the county conceded that the would-be-default was the result of a *force majeure* event.[2] (ECF

---

[2] CARBO argues that this concession renders the assessment of the property overvalued. Because the contract only excused default as a result of a *force majeure* event for the employment requirement—not the duty to pay the PILOTs—the concession that a *force majeure* event had occurred did not mean that the county conceded that economic obsolescence or inutility should be factored into the valuation of the property. (ECF No. 70-26 at 145).

15 / 16

No. 70-2 at 2). The MOU excused performance of the employment promise in the case of a *force majeure* event. (ECF No. 70-26 at 145).

Neither CARBO's arguments nor the evidentiary record so far supports any rational argument that the 2008 MOU and lease agreement have been null since 2017.

## CONCLUSION

The Court finds that the MOU's valuation provisions were valid and enforceable at all times relevant to this proceeding. The MOU's valuation provisions do not allow CARBO to take additional depreciation in the form of inutility or economic obsolescence. A separate order will be entered.

SIGNED 04/12/2023

_____
Marvin Isgur
United States Bankruptcy Judge